Good morning, Your Honors, and may it please the Court, I'm Julie Vandiver, Assistant Federal Public Defender on behalf of Timothy Kemp. He had it so much better than most. He had a mother who loved him, who did her best to take care of him and to protect him. She was always there for him when she could be. He had much more than a lot of people. You see, he's worse than most people because he had no excuse. This is what the prosecutor told the jury in her closing statement at the sentencing phase of Mr. Kemp's first trial. Did Mr. Kemp have it better than most? When he was in utero, his mother got falling down drunk and his father tried to beat the When he was just two days old and still at the hospital where he was born, his father was arrested there for public intoxication. At only six months old, his mother filed an emergency petition for divorce because his father, Verlin Kemp, had beaten her, threatened to kill her. She dropped that petition because she feared if she went through with it, he would actually kill her, Tim Kemp, and his brother Brad. Did Mr. Kemp have it better than most? His father beat him with dog chains and two-by-fours. His father slit the throat of his pet dog because Mr. Kemp loved it more than his father. Did Mr. Kemp have it better than most? He was developmentally delayed. He couldn't walk right. He couldn't retain information. He functioned as an adult, like a seven-year-old child. His mother drank seven days a week, a fifth or more a day. She kept a bottle in her purse and another in the glove box. She was drunk most of the time. By the time he was 13, he was driving her to the liquor store because she was too drunk to do it herself. No, Mr. Kemp did not have it better than most. The story of his upbringing is tragic and it's relevant to his moral culpability. But the juries that decided his punishment heard only a small glimpse of his life story. And the reason why is that trial counsel failed to do a thorough investigation as the Supreme Court has repeatedly held is required in a capital case. Like counsel in Wiggins, trial counsel here had a rudimentary knowledge of his client's life from a narrow set of sources. So what did counsel do? First of all, he did all of the investigation himself. He had no help and he talked to four people. He talked to Mr. Kemp's mother. He talked to his boss. He talked to a paternal aunt and he talked to a childhood friend. He tried to talk to Mr. Kemp's brother by phone. The entire penalty phase in the first trial, including argument, instruction, witnesses, and deliberations was an afternoon. The direct testimony of Lily Kemp, Mr. Kemp's mother, takes up 10 pages in the transcript. And the district court said this was an adequate job because there weren't red flags prompting counsel to do more. And that was error for two reasons. The first is that the base investigation that counsel did that we would rely upon to raise those red flags was inadequate. It wasn't thorough. And the second is based on the little work that counsel did do, there were red flags that any reasonable counsel would have followed up on. The district court was careful to try to take away the distorting effects of hindsight. And I would like to do that too and look at what the standards were in place at the time of Mr. Kemp's trial and what counsel knew or should have known. The Supreme Court has said that the ABA guidelines are evidence of what norms are in capital death cases. And the relevant guidelines for this 1994 trial would be the 1989 ABA guidelines for the performance and appointment of counsel in death penalty cases. So what do those guidelines say? They say that counsel is supposed to undertake a multifaceted investigation into his or her client's life and seek out collateral witnesses and corroboration and to get records to verify the things that you're learning about your client. They also say that supporting services are required for effective defense representation. That the thorough life history investigation cannot be done without the assistance of investigators. And that immediately upon entry in the case, counsel must attempt to obtain the investigative services necessary to prepare for both those phases. In addition to the ABA guidelines at the habeas hearing that was held in this case, we presented a standard of care expert, Sean O'Brien, who testified regarding what was being done in capital cases at that time. He said that the standard of care was to use a skilled investigator to develop this kind of life history. So those are some of the objective things. What about the circumstances in this case? Let me ask you, are there any cases that say you have to use an investigator to not be ineffective? I don't know of any case that says that you have to use an investigator. And I don't think that the court needs to find that. And the Supreme Court has repeatedly said that the determination of whether counsel's work is effective is a case-by-case analysis. And so it may be that in some cases a lawyer could do this kind of investigation themselves, but this was not one such case, which is one of the things that I was about to talk about is this lawyer was... One of your main contentions is the fetal alcohol syndrome, right? Yes. Where would he have found that other than by interviewing the mother, which he did? That is a great question. He did interview the mother, which witnesses say, Cliesta Douglas is one that says that Lily Kemp was addled and never seemed quite too bright to her. And there are indications in the record of maternal drinking from other witnesses. Cliesta Douglas, who said that Lily got falling down drunk while she was pregnant. Ruth Boyd is another aunt that she remembered when Lily Kemp was pregnant with Tim because she was pregnant too. She had a son that was born like three weeks after Mr. Kemp was. And so she had a very good memory pegged to the time and she testified at the habeas hearing that she remembered Lily coming over to her house, smelling like alcohol and slurring her words when she was quite pregnant with Mr. Kemp. Janet Sewell, who was a cousin, we submitted her affidavit at the habeas hearing and she is one of those good Christian people who didn't like drinking. And she remembers that when Lily was pregnant, her grandmother was fretting because Lily was still drinking that old beer and she was worried it would hurt the baby. And there is indications in the record that both the state hospital and Dr. Moneypenny asked Lily Kemp about her pregnancy. And the note is that it was unremarkable. And I would submit that to Lily Kemp, her pregnancy was unremarkable because she spent her whole adult life intoxicated and being beaten by her husband. So she is not the best witness to ask about her pregnancy. She's a witness to ask, but that can't be the end of the investigation. Back to the investigator, was a request made for funds for an investigator? No, there was not. He not a question of inadequate funding because we don't know what the funding would have been if trial counsel had asked for one. That's correct, your honor. And I believe that, as you said, we don't know. But at the time, there was the 1993 Public Defender Act, which provided that reasonable expenses should be paid by the county in any case. In 1991, the Arkansas Supreme Court, there had previously been a $100 expense cap. They had gotten rid of that as unconstitutional. And so there was every reason for this counsel to be asking for investigative resources. He asked to borrow an investigator from the Pulaski County Public Defender Office. That office had asserted a conflict in the case, which is why they weren't representing Mr. Kemp. And they told him, no, I'm sorry, we can't do that because we have a conflict. So rather than taking that one step further, the obvious thing to do would be to ask the court and he failed to do it. And trial counsel testified that the reason why is because he had a strap it on and go mentality and he just decided to do it all himself. And this lawyer was a solo practitioner. He had six other capital cases and he just could not. He just could not do it all himself. And he wasn't getting the kind of help that he would expect from his co-counsel. He did have co-counsel both at trial and at the resentencing. Was he retained or appointed? He was appointed by the court. Did the court know that this lawyer had six other capital cases? He did. He pleaded that in his motion for appointment of co-counsel. And the trial court said trial counts, get the trial court, gave him co-counsel. He received co-counsel, but that was all the, the, um, the help that he, he asked for. He didn't ask for an investigator. Can I take a step back? One of the things I find difficult to understand in these cases is, is, um, how exactly we analyze them under Martinez. So, because the claim was procedurally defaulted, correct? So to get before us, you have to show that post-conviction counsel was ineffective in not raising trial counsel ineffectiveness. And that's, and you, you allege that state doesn't appeal that determination as I understand it. Is that yours? Is that your understanding? Everybody's assuming here that post-petition counsel is ineffective. This wasn't a very close question for the district court, what post-conviction counsel did. Okay. So, but, but so we got, so we get over that hurdle. So now are we, is, is it totally de novo at this point then? Is that what we're looking at is the district court? There's no deference because there's never been raised. There's no adepa deference. Yes. And so the trial, the trial court, in this case, the U.S. district court trial court judge Marshall, he does a complete de novo hearing and we review his hearing, his findings de novo. Is that your understanding of what the procedural posture is? Yes, your honor. Okay. But aren't we looking at whether a substantial question of Strickland prejudice, of Strickland violation was raised to get you over the hurdle first? Yes. I, that is. I don't think they've conceded that. I think the court determined that there was not a substantial question. They did. That, that is what the district court found by looking through to the merits of the claim. So the, the district court, and, and this is kind of basically following what this court said to do in Sasser when it sent that Sasser case back, it said, first decide whether these any merit. And so the district court found that our claim met one of the two Strickland prongs. But I think that judge Malloy, that you're right, that really what this court is looking at is the, the, the Strickland question and it's looking at it de novo. Otherwise, I don't know what, whether you would have, it seems like you would have a and maybe have to show some sort of, you know, quick look at the case. There may be a difference between the Martinez threshold of a substantial question being raised, a substantial issue, and an ultimate finding, I guess is my point. I agree with you. I think that it is a, that whether or not you've pleaded a substantial claim under Martinez is a lesser showing than the full, the full claim necessary to show for relief. And I understand we have to peek through to look at the underlying claim for sure. But really where we're at is that is the substantial question, substantial issue. I think that that's right. But I think there was sufficient evidence presented for the district court and this court to determine the ultimate Strickland question. And I guess that's a little bit what, what, what you just discussed with Judge Grunders kind of was where I'm, my confusion comes in, if you want to call it that. Is that I think in this case, if, if I understand the state of the record, I don't want to say Judge Marshall jumped over the substantial question, but he, he sort of merged the two together, the merits, the ultimate merits and the substantial issue. And then said, because you lose on the ultimate merits, there's no substantial issue. Am I, I mean, I mean, you could have a case where you're here strictly on Martinez before and we, and we would have to decide, is there enough of a question that they should go back for a full evidentiary hearing? But in this case, you jumped right over that hurdle. At least that's the way I view it. And now I may be wrong. That's why I guess I'm confused. I think that that's correct. And we had a little oral argument in this case in front of the district court. And that is Judge Marshall explained sort of how he was viewing the case. And I think that what Judge Malloy, what you're saying is consistent with how Judge Marshall viewed the case as well. So can I, can I go back to my question though? You explained that, you know, there were certain flags and that sort of thing, but other than going to the, to the mother, who else should have been interviewed by the competent counsel? I think an obvious would have disclosed the fetal alcohol syndrome. So you know, counsel was aware of abuse and we know that from the state hospital records. We know that he knows that from talking to Lily Kemp. Child abuse in the home. And I think if he had followed the thread of the abuse, he would have found maternal drinking. He presented some of the abuse, did he not? He did. But to answer your question about who else should he have talked to, had he, he tried to talk to Brad Kemp, Mr. Kemp's brother, who didn't want to talk to him and setting the side of the issue, whether or not he went about that the right way. There were, Mr. Kemp has two half sisters that were also spent a lot of time in this home that shared the same familiar relationship with Verlin Kemp, who he knew to be abusive. He should have talked to them. They both testified at the habeas hearing and had he talked to either of them, he would have learned that Lily Kemp was a very severe alcoholic. And Edith Kemp testified that she remembered, she couldn't really, she was a child. She couldn't really remember when Tim Kemp was, or when Lily was pregnant with Tim Kemp, but she drank before her pregnancy and after her pregnancy. And Rosella Kemp testified that, would the sisters have known that she was drinking during the pregnancy? Well, that, that's what I just said. They remember her basically always drinking. And so further investigation also, he did no investigation into the mother other than talking to the mother. Had he talked to any of her siblings, she had a living sister, Roxy Schultz, who said she was basically spent her life in a bar room. She would have, she would have led to the maternal drinking. Did Dr. Moneypenny do any independent investigation or did he rely solely on the records provided by the attorney? No, he, he preside, he, he talked to Mr. Kemp. He talked to Lily Kemp on the phone after Voidier had already started in the case. And he testified, both trial counsel and he testified that he was not acting as an investigator. And I see that I'm into my rebuttal time. So thank you. Thank you. Good morning, sir. You may proceed. Good morning, ma'am. Please, the court. I'm David Rout from the Arkansas Attorney General's Office here on behalf of Respondent Kelly of the state of Arkansas. The court should affirm Judge Marshall's denial of relief, concluding that Mr. Kemp did not overcome his procedural defaults under Martinez with respect to his investigation or presentation of the evidence that Abel Counsel and her office put on in 2015 of fetal alcohol effects, a diagnosis of post-traumatic stress disorder, PTSD, and additional evidence of extensive family abuse. I think the presentation this morning illustrates the state's and Mr. Kemp's different perspectives on the case. I think that Mr. Kemp's view works only in hindsight. From 2015, the ability to put on the proof that was put on at the Martinez... In effect, did the district court find if this case were judged under current standards, Mr. Kemp was entitled to a new penalty phase. But because we're going back to the 90s, what did the judge say? It probably would have made a difference as far as the additional evidence. His lead trial lawyer, however, didn't stumble in the constitutional sense by not turning up all this new evidence. But again, would counsel's performance past muster today under the current standards of review? No. The district court made two findings in that respect, and I think you're... The conclusion that it wouldn't pass muster, I think the state disagrees with for this reason. The court concluded that, of course, you can't evaluate 1994 and 1997 decisions about how far to investigate, what evidence to put on, in light of the 12 years that federal counsel had in federal habeas, to say nothing of the additional time that passed between 94 and 97 to evaluate deficiencies. Well, even under 1994 standards, we're left with what the district court said. It probably would have made a difference in Kemp's sentence had that evidence been presented. Isn't it disquieting to say that, so what? For the state, it's disquieting. I've seen so many cases out of Arkansas, it seems like for the last 32 years, we've been trying to justify what the Arkansas state court system has done or not done. It's not disquieting in the legal analysis, Your Honor, because although Judge Marshall concluded that one reasonable juror might have changed his or her mind if we could take the 2015 case, assuming you get over distorting hindsight and you actually cram everything that happened in the last 20 years into what trial counsel faced in the roughly short of a year period. It seems odd to me that you can do a prejudice analysis if you haven't identified any deficiency. For the district court to suggest that this would have made a difference at the same time not finding any deficiency, that seems sort of odd to me. I share your sentiment that it's unusual, Your Honor. I mean, the prejudice has to be connected to some deficiency, right? That's right, and the but-for analysis under Strickland, which is, was there deficient performance, which Judge Marshall didn't find, but-for, assuming deficient performance is their prejudice. That's ordinarily the way courts look at it. It's usually the way it's litigated. We jump through to prejudice over deficiency as sometimes those are more difficult factual questions trying to reevaluate counsel's performance, trying to eliminate distorting effects of hindsight. Nevertheless, there are two independent inquiries under Strickland and how they're used under Martinez to determine if there's a substantial claim to overcome the default, and they, because they are independent, they can be evaluated as Judge Marshall did, and I'll say that it's not entirely surprising that after eight days of the hearing and looking at the 2015 case, that's when this hearing occurred, which is why I refer to it as the 2015 case, over a period of several months and eight days, that a judge sitting as the evaluator could conclude this is a lot of information. If I'm a juror, if I'm trying to imagine what a juror would do with this information now, or in 94 and 97, taking myself back with all this information, it's not beyond the pale to conclude one reasonable juror might have reached a different conclusion on prejudice, but I've got to answer the deficiency prong as the court under Strickland and under Martinez to decide is there a substantial claim here? Did Mr. Rosenzweig, trial counsel, principal trial counsel, miss something that was staring him in the face? Did he fail to pursue something that was obvious? As the judge found below, and as this court said in a similar context in Worthington versus Roper, this is not a case on comparison to cases in which trial counsel is missing something staring him in the face. He's making judgments at the time, and if we take ourselves back to Mr. Rosenzweig's position in 1994, he's faced with a client who's committed a quadruple homicide, almost a fifth in the circumstances of the case, in circumstances that well illustrate what could be described as premeditation and deliberation. He left the scene where his revelers, co-revelers, and would-be tormentors had allegedly threatened him in return to kill four of them with a... Can I go back a little bit? Do you agree with Miss Vandiver that our review is de novo? I do, and I meant to say that in the initial presentation, yes, that the standard of review for determination of procedural default is de novo. Okay. Sort of what credence, if any, or effect, if any, should be good to the district court's finding. I guess it was a finding in his mind, at least, that this undisclosed evidence or undeveloped evidence would have made a difference. Do we just pass that off? I know we've disagreed with district court judges in other cases in that, but how do we review that? How much credence do we give it? Well, Your Honor, it's unnecessary to review the district court's view on prejudice, whether you agree or disagree, provided you agree on deficiency. The difficult question of whether you would re-evaluate the prejudice analysis that Judge Marshall brought to bear on the substantial claim question as to prejudice is not necessary because the review here is on the question certified by Judge Marshall, which, as to mitigation, was counsel deficient in investigation and presentation. And I understand the somewhat cognitive dissonance about looking at prejudice and recognizing Judge Marshall thought prejudice may well have been there if you could take this case in 2015. But simultaneously, and rightly, he evaluated what counsel had done at the time facing the facts of the crime that counsel was preparing to defend, the client that he was defending, a 32-year-old man with a strong history of alcoholism, and then the circumstances of a real clock in a real trial. Remember, Mr. Rosenzweig, from the start, did a very good job of preventing the state from introducing evidence that might be additional aggravators, that might undermine the defense view he took from the beginning and went through to resentencing, which was this was the aberrant act of a bad alcoholic who was subject to violent tendencies based on both his diagnosis as somebody with social disorder not specified, alcoholism and other substance abuse, and a very strong family history of abuse. And the jury's mitigators, both at sentencing, original sentencing and resentencing, illustrate that that had some traction. Do I understand from the record correctly that one of, is it Rosenbaum, that was the attorney's name? Rosenzweig. Rosenzweig, that he, one of his major concerns in this trial was trying to keep out evidence of his escape, post-arrest escape, and that he was successful in doing that? That's correct. I mean, that seemed to be sort of an overriding theme, that he was, he didn't want to present any evidence on the mitigator. He didn't want to create some additional aggravators about the escape through the mitigation cases. Is that a fair reading of the record? Yes, it is. That's a fair reading, and that similarly was his view about the potential for aggravators that might have been pursued by the state with respect to other violent conduct after the escape. His decision not to call Mr. Kemp's aunt, one aunt in particular, and pursue an investigation with her or to use her as a witness was because she at least had, it was his understanding that she had aided in, if not the escape, his hiding out afterwards, so to speak. But the fact that he would decide not to call her doesn't mean he couldn't talk to her or investigate. I mean, investigation, you can't make a reasoned judgment about who to call as a witness until you do a thorough investigation. Isn't that, wouldn't that be fair to say as well, though? That is fair to say with the caveat that there are practical limitations for counsel at trial and that, as the district court concluded, the two best observers perhaps were Lily Kemp and Brad Kemp. And Mr. Rosenzweig spent time learning from Lily Kemp the status, remember that Mr. Kemp lived with his mother at the time along with his long-time girlfriend. He, but counsel couldn't make any headway with Brad Kemp at either time. And Brad Kemp, of course, was struggling as his declarations say. He was struggling with what his brother had done. It was difficult for him to confront this and he didn't want to talk to Mr. Rosenzweig about it. But again, it comes to perspective. Could there be more witnesses to interview? Yes, there's timing. And again, I think it's partly about perspective. And this morning's presentation, I think, again, illustrates that with hindsight, 12 years in federal habeas, more than 20 years past a trial, you certainly can uncover a lot more. And Judge Wellman, I think this is, Judge Marshall understood that you can't dispute more was uncovered. You can't spend eight days at a hearing and not see that. The question is, as a matter of competent performance under the Sixth Amendment as used both on a merits claim or in this case, a substantial claim to overcome procedural default under Martinez and Sasser. Using that, you have to evaluate counsel's situation at the time. And the situation, I guess our holding would be if we agreed with your state's position was, although it wouldn't pass constitutional muster today, it was OK in 1994. Again, in the light of hindsight, he should have done more. But at the time, it was adequate. I don't know that I want to write it in quite those stark terms. We'd have to be a little more elegant in our language, I guess. Your Honor, I don't doubt that the court will be, however it decides the case, elegant in the explanation. The conclusion that this wouldn't have been adequate today, I think, is is not a question the court needs to tarry over as to deficiency. It's not a live question what would happen today. And I can't tell you that if this case were tried in 2015 in the same set of circumstances that I wouldn't be able to make a similar argument that Mr. Rosenzweig's strategy of choice here to write to persuade a jury this is the aberrant conduct of an angry drunk one time and not pursue presentation of other things would have been an absolutely deficient strategy. It's a harder case in 2015. I don't dispute that. I don't mean to suggest otherwise. It's not an easy case in 93 and 97. But when you look back through the records here, Mr. Rosenzweig, three times in this case over the course of its litigation, has had an opportunity as a lawyer to illustrate his talents in defending a capital quadruple defendant. He did that through the trial record and the resentencing record. He did that in the post-conviction proceedings in state court, explaining his choices. I thought Lily Kemp, the mother, was the best fact reporter, the best witness to use on family history. I was satisfied with Dr. Moneypenny's report, which was consonant with the state hospital's report about the illness of Mr. Kemp as a diagnosis matter, although Dr. Woods in 2003 and later has a different diagnosis. And no doubt, if we waited another 12 years or pursued this case, there might be yet additional diagnoses. All to the good. All to the good of the advancement of the ability to ensure that capital defendants get mitigation cases the Constitution requires for competent minimum performance. But to evaluate that question, competent minimum constitutional performance, you have to take yourself back to Rosenzweig in 94 and 97. And I said there were three times he had to defend himself, so to speak. He was certainly defending Mr. Kemp at trial. That was the first time. The second time was in state post-conviction. And then it was in this record below. He spent a little more than a day on the stand. I'm excuse me. I thought there was no state post-conviction. I thought that's the reason we were here. There was state post-conviction. There was roughly a day hearing, probably a little less than a day hearing. There was a Rule 37 petition and a hearing conducted by an attorney who's now deceased on behalf of Mr. Kemp. To answer one of your Honor's questions earlier, the state has not disputed that for purposes of evaluating the Martinez claim to be advanced here, we don't dispute that state post-conviction counsel's performance failed of Strickland. It largely relied on Mr. Rosenzweig's view of the case. Post-conviction counsel relied on Mr. Rosenzweig about how to conduct the examination, how to conduct the investigation and the presentation of the state post-conviction case. Which is why I say that's the second time Mr. Rosenzweig explained what he did in light of the circumstances he faced in 94 and 97. And then he did so at this hearing again. And those circumstances, I think, fall helpfully, at least in my mind, when trying to evaluate comparison to other cases, both from this court, other courts, and the U.S. Supreme Court's guidance in this area about deficiency, the minimum investigation, the minimum presentation. Three broad categories. You have to consider, and again, I find this helpful, the crime that trial counsel faced having to both determine how to make a guilt-phase presentation and a penalty-phase presentation. You have to consider the client, is this client young, 32-year-old man, held down a job? And then you consider the clock. There's no clock in federal court. That's not entirely true. But the clock certainly was more generous to the ability to develop a case about what this case could look like if it were tried in 2015. And with those three broad considerations, which I think each of which Judge Marshall brought to bear to explain why while fetal alcohol effects might have been in the air, there was not a basis to do more than Mr. Rosenzweig did with Lily Kemp, especially failing in any ability to, not failing, failing meeting with Brad Kemp, being able to actually get anything from Brad Kemp. Dr. Woods' conclusion, while not to undermine that diagnosis in 2003, wasn't the diagnosis available to Mr. Rosenzweig. As this court has said, you don't have to doctor shop when you're defending a case. It's not unreasonable to conclude that the doctor that state funds have paid for you to retain at your request has determined that the diagnosis you provided, substance abuse, alcohol abuse, is consistent with the defense you hope to raise, an aberrant, drunken rage. And it has all the markings of that. And then lastly, family history. There have to be limits in real time in 1994 to how many interviews you could do. Can you do more? Could there be more? The could is really relatively easy, which is, I think, why Judge Marshall, and by easy, I mean evident. It's evident that more could have been done because it clearly was done. It's not an issue in the case as I see it, but counsel opened her argument by quoting what the prosecutor said about Mr. Kemp had it much better than most. Sir, did Mr. Rosenblatt ever attempt to counter that during the trial? Well, he did. Did he ever stand up and say that's not true? Not in those words. Well, I think his entire defense case was meant to dispute how good that Mr. Kemp may have had it. Well, thank you for the argument. Thank you. Thank you. There's just a couple of things that I'd like to address. First is this question of the escape that you raised, Judge Malloy. The only way in which trial counsel testified that he felt constrained by the escape was offering testimony like Tim Kemp would be a good prisoner or in offering the testimony of this particular witness, Glenn V. Walker. And there were several other people that shared that same relationship to Mr. Kemp who he didn't talk to. And one of the most, I think, really galling evidence of unreasonable behavior of trial counsel was when three of these cases got sent back to be resentenced. He did the exact same thing. He talked to the exact same people, including Glenn V. Walker, who he had said he decided not to call because that would potentially open this door. Why did he talk to her and not say Ruth Boyd? And I think that really goes to show the kind of unreasonable decisions that this counsel was making. And he said that he viewed the second time around as a rerun of the first time, which, as we all know, including him, that first time ended in four death sentences. That is not an episode that you would want to see repeated if you're a defense counsel. And as to the point of hindsight, one thing that I'd like to direct the court's attention to is Mr. Rosenzweig's criticism of the state hospital. So he criticized the state hospital when he's asking for a defense psychologist because all they did was talk to Mr. Kemp's mother and that they didn't expand their evaluation into more records on Mr. Kemp. He was deficient in the exact same way. So this is not something that's only evident in hindsight. This is something that he knew at the time. Also, he knew at the time that an investigator would help. He needed one. He asked the local public defender to borrow one. It was unreasonable not to take that next step and ask the court. And in fact, he was still operating under this system. Like Judge Wolman, you mentioned that had been found unconstitutional by the Arkansas Supreme Court. And so it was unreasonable for him to be stuck in that mentality. And the United States Supreme Court in Hinton v. Alabama said that it is unreasonable to fail to understand the resources that the law makes available to you. And I think that applies here as well. Well, we thank you for your arguments. Thank you. The case is submitted and we will take it under consideration.